No. 3--05--0854

Filed June 14, 2007
APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | Appeal from the Circuit Court |
| | )    for the 12th Judicial Circuit, |
| | )    Will County, Illinois, |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | )    05–CM–1398 |
| | ) |
| GEORGE V. SIMS, | ) |
| | )    Honorable Edwin Grabiec |
| Defendant-Appellant. | )    Judge, Presiding. |
| | ) |

JUSTICE McDADE delivered the opinion of the court:

On November 17, 2005, defendant George V. Sims, was found guilty by a jury sitting in the circuit court of Will County of the offenses of battery and resisting a peace officer, in violation of sections 12-3(a)(2) and 31-1, respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 12-3(a)(2), 31-1). He was subsequently sentenced to one year of conditional discharge and 90 days' imprisonment. He now appeals claiming that the trial court erred in refusing his instruction on self-defense with respect to both charges. For the following reasons, we reverse and remand this cause for further proceedings.

FACTS

Defendant was charged by complaint with one count of battery, two counts of resisting a

peace officer and two counts of criminal damage to property, all Class A misdemeanors. The complaint alleged that he resisted his arrest by Andrew Jose and John Byrne, both peace officers engaged in the execution of their official duties, in that he struggled with the officers while being restrained, and that he committed battery by making contact of an insulting and provoking nature with Byrne by kicking him in the shoulder. The claims in relation to the charges of criminal damage to property involved damage to a telephone and squad car.

On November 16, 2005, defendant's case proceeded to a trial by jury. Initially, the State called Joliet police officer Aaron Bandy, who stated that on the evening of May 2, 2005, he was dispatched to a disturbance at the Budget Inn. Bandy determined that defendant had an outstanding warrant for a failure to appear in an unrelated traffic case. When Bandy knocked on the door, defendant answered and Bandy advised him of the outstanding warrant and took defendant into custody. Defendant was handcuffed and taken down to the parking lot of the hotel. After defendant was placed in Bandy's squad car, defendant's girlfriend, Darnisha Aamons, came downstairs with their two children and was talking to defendant. Aamons and defendant began arguing, whereupon Bandy told her to back away from the squad car. Defendant then became upset and kicked the rear window of the squad car twice. Officers Byrne and Bandy took defendant out of the squad car and attempted to put leg shackles on him, but defendant was uncooperative and struggling. Upon the arrival of assistance, defendant was placed in a cage car and taken back to the police station, where he ripped a telephone off the wall. The police report prepared by Bandy did not mention that defendant kicked the squad car.

Next, the State called Officer John Byrne, who testified he observed defendant kicking the back of Bandy's squad car. The officers removed defendant from the squad car in order to place

2

ankle cuffs on him. Defendant was flailing and kicking, and Byrne pinned him on the ground by sitting on defendant's back and placing his forearm against defendant's neck. Byrne claims that defendant kicked him several times while the officers were attempting to place defendant in ankle cuffs. Byrne denied ever hitting defendant. He also stated that he did not see any other officer strike defendant.

Next, the State called Officer Andrew Jose, who arrived at the scene and observed Byrne struggling with the handcuffed defendant. Jose arrived in a cage car and defendant was placed in the vehicle. Jose got inside the vehicle and pulled defendant in. Because defendant was kicking the window, he was removed so that leg restraints could be put on him. Defendant was ultimately transported to jail in a van. Jose denied ever striking defendant. He also stated that he did not observe Bandy or Byrne strike the defendant.

The defense called defendant's girlfriend, Darnisha Aamons, who testified that defendant was arrested and he was in the police car by the time she got downstairs to give him his coat. The police car began leaving the scene, but then stopped and the officer got out, pulled defendant out of the car, called him a "nigger" and began beating him while he was on his stomach with his hands cuffed behind him. When the officers refused to stop beating defendant, Aamons kicked an officer on the wrist and knocked his watch off. Aamons was maced and handcuffed. Aamons saw defendant in the back of the police car and three officers were hitting him. Aamons stated that defendant could not do anything because his hands and feet were cuffed.

Defendant testified that after he was arrested and placed in Bandy's vehicle, he was speaking with Aamons when Bandy "nudged" Aamons and put his hands on her. Defendant told Bandy not to touch his girlfriend and called one of the officers a name. Byrne then came around

3

and snatched defendant out of the car and called him a "nigger." Byrne threw defendant to the ground face-first and had his knee or elbow on defendant's neck. Byrne pulled defendant's cuffed hands up behind him, hurting him. Defendant was then thrown in the back of Jose's car. Jose then got in the car and began hitting defendant in the ribs. Defendant was then dragged out of the car and hit his head on the bottom door frame of the car. Several officers then pinned defendant on the ground and "roughed [him] up." After the officers succeeded in getting the leg shackles on defendant, defendant was again placed in the backseat of the squad car whereupon Jose continued to hit him. Defendant was then hit in the eye socket with something "cold and metal." One of the officers then maced defendant in the eyes, nose and mouth. Defendant was taken to the hospital where he received a CAT scan and photos were taken of his injuries. Photos of defendant injuries, including his swollen face, the cuts on his wrists, his swollen eye, and his scrapes and bruises were admitted into evidence.

After defendant testified, defense counsel requested that a self-defense instruction be tendered to the jury. The State objected, arguing that there was no testimony regarding excessive force on the part of the officers. The court in denying the instruction noted that defendant never admitted to kicking the officers or that he did so because he was afraid for his safety or because they were beating up on him. Defendant took the stand again for cross-examination and stated that he was peaceful with the officers until the officer pushed his girlfriend. Defendant denied kicking the vehicle, although he described himself as "real feisty" in the caged car. Defendant stated that he was struggling to escape getting hit anymore. Defendant stated that he had been maced before and was not allergic to it. Defendant on redirect claimed his injuries were caused by the Joliet police and that he was afraid during the confrontation.

4

After defendant finished testifying, defense counsel again tendered a self-defense instruction. The trial court also denied this request. Defendant was subsequently convicted of one count of battery, two counts of resisting a peace officer and one count of criminal damage to property for the damage to the telephone. Defendant was found not guilty of criminal damage to property for the alleged damage to the squad car. Defendant now appeals arguing the trial court erred in refusing to tender a self-defense instruction to the jury.

## STANDARD OF REVIEW

[A] trial court's refusal to issue a specific jury instruction is reviewed under an abuse of discretion standard. *People v. Douglas*, 362 Ill. App. 3d 65, 76, 839 N.E.2d 1039, 1049 (2005)*; People v. Miller*, 363 Ill. App. 3d 67, 76, 842 N.E.2d 290, 298 (2005). As defendant points out, our supreme court in *People v. Everette*, 141 Ill. 2d 147, 565 N.E.2d 1295 (1990), stated that "[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense." *Everette*, 141 Ill. 2d at 157, 565 N.E.2d at 1299. However, no court in Illinois has interpreted that statement as an intent by the supreme court to change the standard of review for jury instructions to a *de novo* standard. We therefore refuse to interpret it as such and adhere to the abuse of discretion standard for our review.

## ANALYSIS

In this appeal, defendant claims that the trial court abused its discretion in denying an instruction on self-defense with respect to both the battery charge and the resisting arrest charges. At the outset, we reject the State's assertion that defendant has only contested the judge's refusal to provide a self-defense instruction as to the resisting charges. While the State argues that self-

5

defense cannot apply to a situation where the battery is based upon contact of an insulting or provoking nature, it has failed to cite any case law supporting this assertion. Moreover, the State's argument fails in light of the fact that defendant specifically argued that due to the officers' use of excessive force, he struggled with them, *i.e.*, made contact of an insulting and provoking nature. In this case, therefore, the circumstances of the charges of resisting arrest and battery are so factually intertwined that the self-defense instruction, if warranted at all, should be made applicable to both charges. Perhaps most importantly, however, is the fact that at trial defendant tendered instructions on self-defense as to both charges. Accordingly, we believe that defendant has properly challenged the refusal to provide an instruction on self-defense with respect to both the battery and the resisting arrest charges.

An arresting officer generally may use any force reasonably necessary to effect an arrest and need not retreat in the face of resistance. 720 ILCS 5/7-5(a) (West 2004). A person being arrested, in turn, has no right to use force to resist an arrest by a known police officer, even if the arrest is unlawful. 720 ILCS 5/7-7 (West 2004). This rule is qualified, however, in that it does not apply to a situation in which an officer uses excessive force. *People v. Williams*, 267 Ill. App. 3d 82, 88, 640 N.E.2d 981, 985-86 (1994). The use of excessive force invokes the right of self-defense. 720 ILCS 5/7-1(a) (West 2004). "A person is justified in the use of force against another when and to the extent that [s]he reasonably believes that such conduct is necessary to defend [her]self or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2004).

A defendant is entitled to an instruction on his [or her] theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of

6

discretion for the trial court to refuse to so instruct the jury. *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997). Evidence, however slight, supporting an affirmative defense entitles the defendant to an instruction [citations], even if the evidence is conflicting and the defendant's testimony is impeached. *People v. Swartz*, 186 Ill. App. 3d 399, 401, 542 N.E.2d 515, 517 (1989). Hence, an instruction on self-defense is required in a resisting arrest (or battery) case when the defendant has presented some evidence of excessive force on the part of the arresting officer. *Williams*, 267 Ill. App. at 88, 640 N.E.2d at 986.

We are aware of the case of *People v. Wicks*, 355 Ill. App. 3d 760, 823 N.E.2d 1153 (2005), in which this court arrived at a different decision, affirming a decision of the circuit court of Will County not to give a self-defense instruction in a resisting arrest case. The evidence in that case was so qualitatively different from that produced in the instant case that we believe it can -- and must -- be distinguished.

In *Wicks*, this court noted that the evidence showed that defendant refused from the outset to cooperate with the police. All of their efforts were designed to get his hands out of his pockets so they could effect the arrest. Because his persistent refusal generated a fear that there was a gun in his pocket, the court held that escalation of force was justified and, therefore, not excessive. *Wicks*, 355 Ill. App. 3d at 764, 823 N.E.2d at 1153. The instant case is different.

Like Darius Wicks, defendant Sims contends he was entitled to an instruction on self-defense due to the officers' use of excessive force. Specifically, defendant claims that there was sufficient evidence to show that his use of force, if any, was justified in light of the officers' prior use of excessive force. A review of the record indicates that defendant submitted peacefully to being handcuffed and was placed in the squad car without incident. He did not exercise force

7

against the officers until after his girlfriend arrived at the car. Defendant asserts that he only resorted to force when Officer Bandy put his hands on his girlfriend and Officer Byrne threw him to the ground. Not only did the State fail to put on any evidence that the defendant was resisting or making contact of an insulting and provoking nature before this point, the defendant himself stated that he was calm with the officers until they touched his girlfriend. At trial, the defendant testified in part:

"MR. WHITMORE: Okay. You told Darnisha [girlfriend] that she can call your mom. Then what transpires?

DEFENDANT: Then Officer Bandy, I believe it was, because he the one that arrested me, he came up. He like nudged her. She's holding my baby and he nudged her, like that's enough talking.

* * *

MR. WHITMORE: Then what occurs?

DEFENDANT: Just because he put his hands on her I told him, don't you ever touch my girl again, and I called him a name.

MR. WHITMORE: Then what happened?

DEFENDANT: I guess Officer Byrne comes around. They were getting ready to take me away, but Officer Byrne jumps out. He comes and snatched me out the car, because I guess I called him something that refers to a woman. And he's like, I'll show you who that is nigger, and he threw me on the ground.

8

* * *

MR. WHITMORE: Okay, he throws you on the ground. Where are you at now?

DEFENDANT: I am like right beside the police car on the ground.

MR. WHITMORE: Are you on your belly or on your back?

DEFENDANT: On my belly.

MR. WHITMORE: Where is Officer Byrne?

DEFENDANT: Byrne is like he got his knee in my neck, or something was, it was either his knee or elbow, but he had it in my neck so my face was getting like nudged in the concrete.

* * *

MR. WHITMORE: All right. What occurs next?

DEFENDANT: They started hurting me. And I was like --

MR. WHITMORE: Okay, describe hurting.

DEFENDANT: My -- just cheap shots, you know, like a little punch here to the rib, or like lifting the cuffs up on my wrist. So I told, you know, Darnisha was coming back, and I'm like, they hurting me."

Defendant went on to testify that the officers then proceeded to throw him into the back of Officer Jose's squad. In regard to these events, the following exchange took place:

"MR. WHITMORE: You are back in Jose's car at this time.

9

Then what occurs?

DEFENDANT: Then I'm trying to get away because Jose, you know, I guess he mad about what I was calling him names and stuff. He get back in the car with me, and --

MR. WHITMORE: What do you mean he gets back in the car with you? In the driver's seat?

DEFENDANT: No. I'm like, I'm in the back seat on my stomach. He get back in the car with me and get on top of me.

MR. WHITMORE: He joins you in the back seat?

DEFENDANT: Yeah. He wanted, you know, he still wants to keep hitting me.

MR. WHITMORE: Where is he hitting you?

DEFENDANT: Like in my ribs. And there was an officer at the back holding my feet. And I was trying to get away from him.

MR. WHITMORE: What do you mean? You're leg shackled and handcuffed. You are on your belly. How are you trying to get away?

DEFENDANT: I am trying to scoot down to the floor because, you know, it's limited space.

MR. WHITMORE: So you are trying to squirm down to the floor?

DEFENDANT: Yeah. If I squirm down to the floor boards

10

I could avoid getting hit.

MR. WHITMORE: You are intending to do that but what occurs?

DEFENDANT: There was another officer by the front of the car, and he threatened me with the mace one more time. And I'm like, I'm like man, I don't want to get maced, man. You all quit hitting me, quit hitting me. And they saying stop doing this. I'm like well, quit fucking hitting me. And I guess he get mad, you know. Something hit my face.

MR. WHITMORE: What do you mean something hit your face?

DEFENDANT: They didn't hit me with a fist.

MR. WHITMORE: What did it feel like?

DEFENDANT: Something cold and metal.

MR. WHITMORE: Where did they hit you?

DEFENDANT: They hit me right here, and it caused so much pressure it cracked right here."

Based on this testimony, we believe the jury could reasonably have found that defendant forcibly resisted arrest only after the officers applied excessive force. The evidentiary photos support this possibility as they revealed that defendant's face was extremely swollen, his right eye was swollen completely shut, and he sustained numerous cuts, scrapes and bruises. We therefore find the evidence sufficient to raise an inference that defendant's actions constituted self-defense.

11

Of course, we express no opinion as to whether the officers, in fact, used excessive force to arrest defendant. That is a matter for a jury to decide. The issue is whether the jury should have been instructed on the law of self-defense. Because excessive force and self-defense were raised by the evidence, defendant was entitled to his requested instruction.

While the State relies upon the officers' testimony in claiming that defendant did not meet the "very slight evidence upon a given theory" standard necessary to require an instruction on self-defense, it ignores the fact that a defendant is entitled to have the jury instructed on any defense even in the face of conflicting testimony. *People v. Jefferson*, 257 Ill. App. 3d 258, 265, 628 N.E.2d 925, 930 (1993). We also find no justification for the trial court's denial of the instruction on the basis that defendant never admitted to kicking the officers, or claimed that he did so because he was afraid for his safety. While defendant may not have specifically admitted to "kicking" the officers, he did acknowledge that he was "pretty feisty" and "struggled" with them throughout the entire incident. Moreover, both Officer Bandy and Officer Byrne testified that defendant was "flailing his feet," generally uncooperative and kicked them several times. As to the trial court's claim that defendant never stated he was afraid for his safety, a review of the record proves the contrary. Defendant, on redirect, specifically testified that he was afraid during his encounter with the officers. Defendant's testimony of attempting to dodge the officers' blows support his claim of fear. Accordingly, we reject both the State's claim and the trial court's justification for denying the requested instructions.

We conclude that defendant was entitled to the benefit of his affirmative defense as shown by the evidence in the record. Defendant's testimony that he was "afraid," "trying to get away," and "struggling" with the officers satisfies the requirement that defendant present a "slight"

12

amount of evidence supporting his claim of self-defense. We therefore find that the trial court was required to give the jury the instruction of self-defense. Its refusal to do so was an abuse of discretion, which deprived the jury of the necessary tools to analyze the evidence fully and to reach a verdict based on those facts.

Accordingly, we reverse the judgment of the circuit court of Will County and remand for further proceedings if the State so chooses.

Reversed and remanded.

LYTTON, P.J. and CARTER, J., concur.